IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT § | | |
| OPPORTUNITY COMMISSION, § | | |
| § | | |
| Plaintiff, § | CIVIL ACTION NO. | |
| § | | |
| V. § | 3:06-CV-1732-K | |
| § | | |
| EXXON MOBIL CORPORATION, § | | |
| § | | |
| Defendant. § | | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion for Summary Judgment (Doc. No. 31). The Court **GRANTS** the motion because there are no genuine issues of material fact.

**I. Factual and Procedural Background**

Defendant Exxon Mobil Corporation ("Exxon") is a fully integrated global oil and gas company with its own aviation department. Exxon's aircraft fleet includes nine sophisticated jets—four Bombardier Global Express jets and five Bombardier Challenger 300 jets. These planes carry 8 to 11 passengers, have a range of 3,000 to 6,000 miles, and a top speed of over 500 nautical miles per hour. Exxon's aviation department provides air transportation to employees and business associates. All of Exxon's domestic and international flights involve the transportation of passengers. In 2005, Exxon pilots carried nearly 4,000 passengers over 2,000,000 nautical miles.

At the time this suit was commenced Exxon maintained a corporate policy which prohibited its pilots from flying corporate aircraft after they reached the age of 60 and forced such pilots to involuntarily retire at that age (hereinafter "Age 60 Rule"). Exxon's Age 60 Rule mirrored a rule used by the Federal Aviation Administration ("FAA") which applied to pilots flying for commercial airlines. Because Exxon's pilots were "company pilots"— as opposed to "commercial pilots"— the FAA rule did not directly apply to them. Since the filing of this suit, Congress has passed and the President has signed the Fair Treatment for Experienced Pilots Act (hereinafter "FTEPA" or "the Act"). The Act raised the mandatory retirement age for commercial pilots to 65 subject to a limitation relating to international flights. *See* 49 U.S.C. § 44729. Exxon has since altered its retirement rule to mirror the new rule enacted by Congress.

On June 19, 2006, Michael Morschauser, an Exxon pilot, received a letter from Exxon stating that "in keeping with the Company's policy to have pilots cease flying upon reaching age 60," Exxon would remove Morschauser from flight duty on September 7, 2006, his 60th birthday, and retire him by October 1, 2006. Morschauser and former Exxon pilot Glen Skaggs filed separate Charges of Discrimination in the EEOC's Dallas District Office alleging discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"). 29 U.S.C. § 623. Based on those charges, the EEOC issued a Letter of Determination on August 16, 2006 finding that Exxon's Policy violated the ADEA. The EEOC found that Exxon discriminated against Morschauser,

Skaggs, and other similarly situated employees in violation of the ADEA.

On September 22, 2006, the EEOC filed this action under the ADEA seeking, among other things, an injunction prohibiting Exxon from enforcing its Age 60 Rule. The EEOC filed an application for preliminary injunction along with its complaint in this case. On February 26, 2007, the EEOC filed a Supplemental Brief and Amended Request for Preliminary Relief (Doc. No. 24) which added Exxon pilot Burford "Buff" Barrett to the class of similarly situated pilots who were removed from active flight status at the age of 60 by Exxon. Exxon removed Barrett from active flight duty on December 7, 2006. Similarly, on May 18, 2007, the EEOC filed a Supplement to its Petition for Preliminary Injunction (Doc. No. 25) to add (1) Steven Hermann, (2) Gary Schaffer, and (3) Thomas O'Malley to the class of similarly situated pilots who will be removed from active flight status because of Exxon's Age 60 rule by June 1, 2007. In its Order dated May 30, 2007, the Court denied the EEOC's request for a preliminary injunction.

The passage of the FTEPA does not significantly alter the Court's analysis in this case. The EEOC still argues for an injunction to prevent Exxon from enforcing a mandatory retirement age for its pilots that mirrors the rule applied to commercial pilots by the FAA. Exxon still argues that its mandatory retirement age is not a violation of the ADEA because it constitutes a bona fide occupational qualification ("BFOQ")—particularly in light of its congruence with the rule applied by the FAA.

## II. Summary Judgment

Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Summary judgment on an affirmative defense is appropriate when the party asserting the defense has conclusively establishes the defense as a matter of law. *Crescent Towing & Salvage Co. v. M/V Anax*, 40 F.3d 741, 744 (5th Cir. 1994).

## III. Defendant's Motion for Summary Judgment

Exxon contends that its policy of removing pilots from active flight status when they attain a specified age constitutes a BFOQ under the ADEA. The FAA's Age 60 Rule provided that no airline carrier "may use the services of any person as a pilot . . . if that person has reached his 60th birthday. No person may serve as a pilot [in commercial airline] operations . . . if that person has reached his 60th birthday." 14 C.F.R. § 121.383(c). The FTEPA, which was effective as of December 13, 2007, repealed the FAA's Age 60 Rule and provided, subject to a limitation related to international travel, "a pilot may serve in multicrew covered operations until attaining 65 years of age."

The ADEA prohibits discrimination "against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). However, the ADEA also provides that it shall not be unlawful for an employer to take any action otherwise prohibited by the ADEA "where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." 29 U.S.C. § 623(f).

In order to prevail on a BFOQ defense, an employer must show that the age limit is reasonably necessary to the essence of the business. *Western Air Lines, Inc., v. Criswell*, 472 U.S. 400, 414-15 (1985); *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 227-28 (5th Cir. 1976). The employer must also demonstrate that all or substantially all of the individuals excluded from the job are in fact disqualified, or that some excluded individuals possess a disqualifying trait that cannot be ascertained except by reference to age because it is impossible or highly impractical to deal with employees on an individualized basis. *Western Air Lines, Inc.*, 472 U.S. at 414-15; *Usery*, 531 F.2d 227-28.

Exxon contends that its reliance on the FAA rule prohibiting a pilot from flying after they reach a particular age is probative evidence of a BFOQ. Whether reliance by an employer on a government agency's age-related rule is probative of a BFOQ, in this context, depends upon the congruity between the occupations at issue and the weight of the evidence supporting the rule's rationale. *Western Air Lines, Inc.*, 472 U.S. at 418. In this case, the dispute focuses on the congruence between the duties of a commercial airline pilot and the duties of an Exxon pilot. It is undisputed that the rationale for the

government's age-related rule for commercial pilots is based on safety. It is further undisputed that Exxon's pilots, unlike commercial pilots, are not subject to the government's mandatory retirement age imposed by law for commercial pilots. It is also undisputed that Exxon, as a matter of company policy, has voluntarily decided to comply with the same rule that is mandatory for commercial pilots.

### A. Mandatory Retirement for Commercial Pilots

The FAA has concluded that it is impossible to predict, with reliable accuracy, the presence or onset of various medical problems in an aging pilot or detect and measure adequately declining physical and mental functions. In July 2005, during hearings before the Subcommittee on Aviation of the Senate Committee on Commerce, Science & Transportation, Dr. Jon L. Jordan, the FAA's Federal Air Surgeon, stated,

> [The Age 60 Rule] remains the best determination that can be made of the time when a general decline in health-related functions and overall cognitive capabilities has reached a level where decrements in a pilot's performance may jeopardize safety. The "Age 60 rule" has been repeatedly reviewed to determine whether new and sufficient evidence exists to warrant a reconsideration of the regulation. Studies conducted to date do not present sufficient information that would address concerns about negatively impacting the current level of safety by changing the rule.

Likewise, as recently as March 2006, during another hearing before the Subcommittee on Aviation regarding the FAA's fiscal year 2007 Budget, the FAA stated:

> The FAA has conducted five studies, using various analytic methodologies, on the relationship of pilot age to accidents. The most recent study, published in April 2004, corroborates the findings of two previous empirical studies—specifically that accident rates appear to increase with pilot age. Recent

non-FAA research, published in 2005 in open, peer-reviewed scientific literature, reported that the risk of violations of flight regulations increased with age in a longitudinal study of commuter air carrier and air taxi pilots. Violations of flight regulations are important indicators because pilots with violations are more likely to be involved in accidents or incidents than pilots without violations. The "Age 60 rule" has served well as a regulatory limit in the United States. The FAA recognizes that science does not absolutely dictate what age is most appropriate for retirement. No absolute, scientific formula may readily be applied to predict progressive, anatomic, physiological, and cognitive decline associated with aging because it is variable in severity and onset among individuals. The consistency of findings across empirical studies, however, suggests that changes to the "Age 60 rule" should be approached cautiously; so, we presently have no plans to revise the rule.

While the FTEPA altered the age at which mandatory retirement occurs, it did not alter the government's reliance on age as a determinative factor in deciding when a pilot may no longer fly. The FTEPA was modeled, in part, on the rule used by the International Civil Aviation Organization ("ICAO"). Under the ICAO rule, either the pilot or co-pilot may fly up to age 65 as long as the other pilot is under age 60. The FTEPA adopts the same rule with respect to international flights, requiring at least one pilot to be under the age of 60.

Exxon argues that the rationale that supports the FTEPA's mandatory retirement age for commercial pilots applies with equal force to Exxon's mandatory retirement rule for its company pilots. The EEOC argues that material differences exist between the duties performed by commercial pilots and Exxon's company pilots such that age is not a BFOQ for Exxon's pilots.

### B. Similarity of Work Performed By Exxon Pilots

Exxon contends that the work performed by its pilots is substantially similar to, and sometimes more onerous than, the work performed by commercial airline pilots. Consequently, Exxon argues that its operations are congruent with those of commercial airlines in all material ways, and that its policy of mandatory retirement constitutes a BFOQ. Specifically, Exxon points to its planes, the experience and qualification of its pilots, and the job responsibilities of its pilots.

#### 1. Exxon's Planes

In its motion for summary judgment Exxon argues that its planes are comparable to commercial airplanes. Exxon's current fleet includes nine sophisticated jets, including four Bombardier Global Express jets and five Bombardier Challenger 300 jets. These planes carry 8 to 11 passengers, have a range of 3,000 to 6,000 miles, and a top speed of over 500 nautical miles per hour. The Global Express jets can fly between any two points on the globe with only one refueling stop. It is undisputed that Exxon's aircraft fly as fast as, or faster than, most commercial airlines and far faster than twin-engine turboprop planes operated by many U.S. regional airlines.

The EEOC argues that the planes flown by Exxon's pilots are not similar to commercial planes. The EEOC points to "significant differences" between Exxon planes and commercial airplanes including "how and when to deploy engine thrust reversers,

how to apply the speed brakes and spoilers, use of nose wheel steering, braking techniques, operations at altitudes above 41,000 feet, specific operation of engines, cross feed/transfer of fuel, hydraulic and environmental systems and use of Flight Management Computers."

Exxon responds by arguing that the differences pointed out by the EEOC are not material. The Court agrees. The primary thrust of the Court's inquiry on this issue is whether the safety concerns that motivate the FAA rule are equally applicable to Exxon and its aircraft. The EEOC goes into painstaking detail describing the differences between Exxon's aircraft and commercial aircraft; the EEOC goes as far as to submit summary judgment evidencing pointing out differences in the lavatories, the type of coffee provided on board, and towels used in the planes. Needless to say, these are nothing more than distinctions without differences. The Court is persuaded that there is no material difference, for purposes of this inquiry, between the planes used by Exxon, and the type of planes used by commercial airlines.

### 2. Experience and Qualification of Pilots

Exxon argues that its pilots are substantially similar to commercial pilots in both experience and qualifications. Exxon employs 27 pilots. To be hired by Exxon, pilots must hold an Air Transport License, the highest level of qualification for pilots, and have broad international experience. Exxon says that it requires international experience because its pilots fly all over the world, to such places as Tokyo, Shanghai, Melbourne,

Kuwait City, Cairo, Angola, Cameroon, Venezuela, Ecuador, London, Paris, Rome, Prague, Kazakhstan, Norway, and Moscow. The EEOC apparently does not dispute that Exxon pilots are substantially similar to commercial pilots with respect to experience and qualifications. Instead, the EEOC argues that the actual job responsibilities of Exxon pilots are materially different than those of commercial pilots.

### 3. Job Responsibilities of Pilots

Exxon contends that the job responsibilities of its pilots are at least as significant as those of commercial pilots, if not more so. It is undisputed that both Exxon and commercial airlines generally staff their cockpits with two people—the captain and the first officer. It is undisputed that unlike commercial pilots who receive a weather and flight plan prepared by a licensed dispatcher, Exxon pilots perform their own route planning, weather checking, and fuel computations. Exxon also contends that "Once airline and Exxon pilots board the plane, their pre-flight and cockpit responsibilities while flying are substantially similar." In support of that contention, Exxon points out that "Exxon and commercial pilots fly in the same airspace and air traffic control sectors, under identical weather conditions, and take off and land at the same congested domestic and international airports. They use the same air traffic controllers and the same approach and departure routes."

The EEOC responds contending that "while pilots for [Exxon] might fly jet aircrafts in public airspace, their job responsibilities, duties, and overall mission are quite

different than those of commercial airline pilots." In support of its contention, the EEOC points out that commercial airlines attempt to provide safe air transportation to the public in a manner that will be profitable to the airline, while Exxon's pilots are responsible for transporting executives and guests to business and vacation destinations. Even assuming the accuracy of the EEOC's depiction of the purpose of Exxon's air operations, no genuine issue of material fact is raised. At this juncture, the Court is concerned with whether the safety concerns that drive the federal law mandating retirement of commercial pilots apply with equal force to Exxon's pilots. The fact that Exxon's aviation operation has a different purpose than a commercial airline is not material.

The EEOC goes on to argue that passengers on Exxon flights have a far greater degree of control over the flight than passengers on commercial flights. Exxon does not dispute this fact, but argues that it is not material. The Court agrees with Exxon. Like many of the other distinctions pointed out by the EEOC, this distinction does not demonstrate a material difference in the underlying safety concern applicable both to flights conducted by commercial pilots and Exxon pilots.

Finally, the EEOC argues that the size of Exxon's aviation department makes it materially different than commercial airlines. The EEOC points out that Exxon has only 27 pilots, while most commercial airlines employ far more pilots. The EEOC claims that "the relatively small size of this crew means that Exxon Mobil pilots often fly with co-

workers with whom they are very familiar." In contrast, the EEOC points to evidence that commercial airline pilots frequently fly with a co-pilot that they have never met before the flight. As a consequence, the EEOC contends, safety concerns that exist in the context of commercial airline flight, are not as significant for Exxon's aviation operations. Even if the EEOC is right on this point, the summary judgment evidence establishes that the vast majority of safety concerns that apply to commercial airline pilots apply with equal force to Exxon's pilots. Most fundamentally, a concern that as a pilot's skills deteriorate with age the risk of an accident increases applies to both commercial pilots and Exxon's pilots. The EEOC has not offered summary judgment evidence that demonstrates that the increased familiarity among Exxon's pilots would eliminate, or even substantially reduce, the risk of an accident.

Based on the summary judgment evidence presented, the Court concludes that the worked performed by Exxon's pilots is congruent with the work performed by commercial airline pilots in all material ways. Consequently, the existence of the federal age-related rule applicable to commercial airline pilots is highly probative of Exxon's BFOQ defense in this case.

### C. Exxon Has Established a BFOQ Defense as a Matter of Law

While the ADEA protects workers from discrimination based on age, an employer may lawfully take any action otherwise prohibited by the ADEA where age is a BFOQ reasonably necessary to the normal operation of the particular business. 29 U.S.C. § 623(f); *Equal Employment Opportunity Comm'n v. El Paso Natural Gas Co.*, 626 F. Supp.

182, 184 (1985). Because of the congruence between the work performed by Exxon pilots and the work performed by commercial pilots, the federal age-related rule is highly probative of Exxon's BFOQ defense. Consequently, Exxon has demonstrated, as a matter of law, that some pilots possess a disqualifying trait that cannot be ascertained except by reference to age because it is highly impractical to deal with employees on an individualized basis. *Western Air Lines, Inc.*, 472 U.S. 400; *Usery*, 531 F.2d 224.

### IV. Conclusion

Because the EEOC is unable to raise a genuine issue of material fact with respect to Exxon's BFOQ defense, the Court concludes that summary judgment is appropriate. Exxon's motion for summary judgment is **GRANTED**.

**SO ORDERED**.

Signed April 28th, 2008

*Ed Kinkeade*
ED KINKEADE
UNITED STATES DISTRICT JUDGE